# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

VERBERY WALKER,
also known as "Verb," and
FRED MAHAFFY

CRIMINAL COMPLAINT

CASE NUMBER  08CR 281

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief:

Between on or about April 2, 2008 and April 5, 2008, in Cook County, and elsewhere, in the Northern District of Illinois, defendants did,

conspire with each other and others to knowingly and intentionally possess with the intent to distribute and to distribute a controlled substance, namely, five kilograms or more of a mixture containing cocaine, a Schedule II Narcotic Drug Controlled Substance,

in violation of Title 21 United States Code, Section 846.

I further state that I am a(n) Special Agent, FBI, and that this complaint is based
                                   Official Title
on the following facts:

See Attached Affidavit.

Continued on the attached sheet and made a part hereof:  X  Yes  ___ No

FILED
APR 07 2008
MAGISTRATE JUDGE SUSAN E. COX
UNITED STATES DISTRICT COURT

Signature of Complainant

Sworn to before me and subscribed in my presence,

April 7, 2008                                at    Chicago, Illinois
Date                                                City and State

Magistrate Judge Susan E. Cox
Name & Title of Judicial Officer                    Signature of Judicial Officer

STATE OF ILLINOIS    )
                     )  SS
COUNTY OF COOK       )

## AFFIDAVIT

I, Christopher M. Soyez, being duly sworn under oath, depose and state the following:

### Background of Affiant

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed for nearly one year. I am assigned to the FBI Chicago Division Field Office, South Resident Agency, Violent Crimes and Major Offenses Unit, where my duties include the investigation of various violent crimes, including bank robberies, armored car robberies, drug investigations and gang investigations. In my capacity as a Special Agent, I have received training and gained experience in the enforcement of laws concerning controlled substances as found in Title 21 of the United States Code.

### Basis of Knowledge and Purpose of Affidavit

2. I base the information outlined in this Affidavit on personal observation, knowledge and information related to me by other Agents and law enforcement officers, information obtained by consensual audio recordings, information from a Cooperating Source, physical surveillance, and my training and experience in the investigation of narcotics and other offenses.

3. I am making this Affidavit in support of a criminal complaint to be presented to the United States District Court, Northern District of Illinois, for the purpose of

establishing probable cause for the arrests of VERBERY WALKER, also known as "Verb," and FRED MAHAFFY. The criminal complaint charges that VERBERY WALKER, a/k/a "Verb," and FRED MAHAFFY knowingly conspired to possess with intent to distribute and to distribute a controlled substance, namely five kilograms or more of a mixture containing cocaine, in violation of Title 21, United States Code, Section 846. Because the information set forth below is for the limited purpose of establishing probable cause, this Affidavit does not contain all the information known to law enforcement regarding this investigation.

4.      In this Affidavit, I have summarized some intercepted conversations made during the course of the investigation. To the extent that Affiant uses quoted language in this Affidavit from those intercepted conversations, the quotes are taken from careful review of the conversations but are still in draft format and are not intended to be final transcripts or quotations.

### Background of Drug Trafficking Investigation

5.      On or about April 1, 2008, an individual (hereinafter referred to as "the CS") was arrested by the FBI, after a hand-to-hand narcotics transaction involving approximately 70 grams of crack cocaine. Following his/her arrest, the CS agreed to cooperate with law enforcement. The CS agreed to cooperate with law enforcement in return for consideration of his/her cooperation during sentencing for as-of-yet unfiled charges in connection with the CS's involvement in narcotics trafficking. As further described below, the CS's information has proven credible and reliable in that much of it has been independently corroborated

through consensually recorded telephone calls and physical surveillance. Based on information presently known to law enforcement, the CS has one prior conviction for possession of between 100 and 400 grams of cocaine.

6. The CS provided information to law enforcement that the CS receives narcotics from two individuals that "work" their narcotics transactions together; the first is an individual known to the CS as "FRED," and the second individual known to the CS as "VERB." As further described below, "FRED" was later identified by law enforcement as FRED MAHAFFY (hereinafter referred to as "MAHAFFY"). As further described below, "VERB" was later identified by law enforcement as VERBERY WALKER (hereinafter referred to as "WALKER"). According to the CS, in the past, MAHAFFY and/or WALKER would contact the CS, via telephone, when MAHAFFY and/or WALKER received a shipment of narcotics. The CS explained to law enforcement that both MAHAFFY and WALKER use telephone number (773) 567-3334 to contact the CS regarding their narcotics transactions with the CS. In addition, according to the CS, once MAHAFFY and/or WALKER would place such a call, the CS would typically meet MAHAFFY and/or WALKER at a bar, usually Duke's Cocktail Lounge, located near the intersection of 79th Street and Indiana Avenue, Chicago, Illinois (hereinafter referred to as "Duke's") to pick up the narcotics from MAHAFFY and/or WALKER. The CS further explained that during past transactions between MAHAFFY, WALKER, and the CS, the CS was able to obtain multiple kilogram-quantities of cocaine from MAHAFFY and/or WALKER on a fronted basis. The

CS also explained that approximately one to two weeks after obtaining fronted cocaine, the CS would meet with either MAHAFFY, WALKER, or both to pay for the cocaine that MAHAFFY and WALKER had fronted the CS. The CS also stated that the CS would typically receive approximately one kilogram of powder cocaine from MAHAFFY and/or WALKER once every two weeks, over the past two-year period. The CS further explained that on at least three prior occasions, the CS was present when MAHAFFY and WALKER distributed duffel bags containing cocaine to the CS and to other customers of MAHAFFY and WALKER. Specifically, the CS described that on approximately three prior occasions the CS was with WALKER and personally observed WALKER make distributions of duffel bags containing narcotics to other customers, and on at least two of those three occasions, the CS was present and personally observed both MAHAFFY and WALKER distribute the duffel bags containing narcotics to other customers. The CS also described receiving as much as two kilograms of powder cocaine from MAHAFFY on at least one of these occasions. The CS explained that more recently, MAHAFFY and WALKER had asked the CS to take more than two kilograms at one time.

7. According to the CS, shortly after his/her arrest, the CS placed and received telephone calls to and from MAHAFFY and WALKER. MAHAFFY and WALKER related to the CS that MAHAFFY and WALKER had learned that the CS was recently arrested by law enforcement (referring to the April 1, 2008, arrest of the CS). During these calls, the CS attempted to dispel MAHAFFY's and WALKER's concerns about the arrest. In response,

MAHAFFY and WALKER told the CS that MAHAFFY and WALKER wanted the CS to stop using the CS's old telephone and to purchase a new telephone. MAHAFFY added that MAHAFFY himself would also obtain a new telephone. MAHAFFY then instructed the CS to wait for MAHAFFY's call.

8. On April 2, 2008, in the morning, the CS received an incoming telephone call from MAHAFFY. According to the Caller Identification feature on the CS's telephone, MAHAFFY contacted the CS from telephone number (773) 567-3334. This call was recorded. During the conversation, the CS and MAHAFFY discussed arranging a meeting between the two sometime in the near future.

9. On April 3, 2008, in the afternoon, the CS received an incoming telephone call from MAHAFFY. According to the Caller Identification feature on the CS's telephone, MAHAFFY contacted the CS from telephone number (773) 567-3334. This call was recorded. During the conversation, MAHAFFY told the CS, "right now while I'm not doin' nothin,' I'm sure gonna get me a motherfuckin' phone. I am waiting on one motherfucker to come so that's why I'll probably get it tomorrow." The CS asked MAHAFFY, "you're saying you getting a phone tomorrow?" MAHAFFY responded, "yeah I'm gonna get it tomorrow." The recorded call ended with the CS telling MAHAFFY, "call me....and I'll just run into you somewhere." According to the CS, the CS understood MAHAFFY's reference to "right now while I'm not doin' nothin'..." to mean that MAHAFFY was presently not ready to distribute narcotics. In addition, the CS further explained that this telephone call

was regarding the earlier conversations the CS and MAHAFFY had where MAHAFFY told the CS that MAHAFFY wanted the CS to stop using the CS's old telephone and to purchase a new telephone and that MAHAFFY would do the same. Your Affiant knows, based on discussions with the CS, discussions with other law enforcement officers, and my training and experience as an FBI Special Agent investigating narcotics offenses, that drug dealers often discard their telephones and frequently obtain new telephones to use for their drug trafficking activities in an effort to thwart detection by law enforcement. Further, your Affiant is aware that the discarding of phones by drug traffickers is particularly true when drug traffickers sense an increased law enforcement presence or when an arrest of a drug associate is made.

10. On April 3, 2008, in the late afternoon/early evening, the CS received an incoming phone call from MAHAFFY. This call was not recorded. During the conversation, MAHAFFY told the CS that the CS would be hearing from MAHAFFY soon, possibly as early as that evening, in order for the two to meet face to face. After the conversation, the CS contacted law enforcement and relayed the information. The CS explained to law enforcement that the CS understood the telephone conversation to be regarding a future narcotics transaction between the CS and MAHAFFY. The meeting on the evening of April 3, 2008 did not occur.

11. On the morning of April 5, 2008, the CS received at least one incoming telephone call from telephone number (773) 567-3334. The CS did not answer the call(s).

Thereafter, the CS contacted law enforcement to inform law enforcement that the CS was receiving calls from the telephone number that MAHAFFY and WALKER typically use to contact the CS. At the direction of law enforcement, the CS called telephone number (773) 567-3334 to find out what MAHAFFY or WALKER wanted. The CS placed the call. This call was not recorded. After the conversation, the CS contacted law enforcement to tell law enforcement about the call. The CS stated that he spoke with WALKER during the conversation. According to the CS, during the call, WALKER advised the CS that WALKER and MAHAFFY wanted to meet with the CS at Blackie's, a bar/restaurant, located at the intersection of South Clark Street and West Polk Street, Chicago, Illinois (hereinafter referred to as "Blackie's"). The CS agreed to meet with WALKER and MAHAFFY. The CS explained to law enforcement that the CS, on at least one prior occasion had met with MAHAFFY and WALKER at Blackie's in order to pick up a quantity of fronted narcotics. The CS further explained to law enforcement that the CS's understanding of the purpose of the meeting was to meet with WALKER and MAHAFFY at Blackie's for the purpose of picking up narcotics, on a fronted basis, from WALKER and MAHAFFY. The CS agreed to assist law enforcement and wear an audio recording device and electronic transmitter during the CS's meeting with MAHAFFY and WALKER.

### April 5, 2008 Drug Transaction

12.     On April 5, 2008, in the morning, the CS met with law enforcement at a predetermined location. Law enforcement equipped the CS with an audio recording device

and an electronic transmitter. Law enforcement also searched the CS and the CS's vehicle for the presence of narcotics or other contraband with negative results. The CS left the area and proceeded to Blackie's. Law enforcement maintained surveillance of Blackie's and the surrounding area. Law Enforcement observed the CS's vehicle arrive in a parking lot located at the southwest corner of the Clark Street and Polk Street intersection. When the CS parked the CS's vehicle in the abovementioned parking lot, the CS relayed to law enforcement that the CS was parking next to two vehicles that the CS knew were used by WALKER and MAHAFFY. Specifically, the CS told law enforcement that WALKER uses a gold van and MAHAFFY a black Trailblazer. In addition, the CS provided law enforcement the license plate numbers of the two vehicles. Law enforcement conducting surveillance was able to observe a gold-colored minivan (hereinafter referred to as "the Minivan") parked directly behind a black Trailblazer (hereinafter referred to as "the Trailblazer") in the center of the abovementioned parking lot. Law enforcement observed the CS park his/her vehicle directly next to the Minivan. Subsequently, law enforcement ran the license plate number of the Minivan (IL license plate G570496). A review of Illinois Secretary of State records reflect that the minivan is registered to Individual A, 8761 W. 85th Street, Building 17, Apt #307, Justice, Illinois. Law enforcement also ran the license plate number of the Trailblazer (IL license plate G582213). A review of Illinois Secretary of State records reflect that the Trailblazer is registered to "FRED McHAFFY," 819 Russell, DeKalb, Illinois.

   13.  Shortly after the CS parked his/her vehicle, law enforcement observed the CS

enter into Blackie's. The meeting inside Blackie's was recorded. Law enforcement later debriefed the CS regarding the meeting at Blackie's. The CS explained that once inside Blackie's, he/she met with WALKER and MAHAFFY. The three sat together and engaged in conversation. According to the CS, at the beginning of the conversation, MAHAFFY and WALKER asked the CS why he/she was so late for the meeting. According to the CS, MAHAFFY and WALKER told the CS about other individuals that MAHAFFY and WALKER met with before the CS arrived. Specifically, the CS recognized the names that MAHAFFY and WALKER indicated that they had met with as being customers of MAHAFFY and WALKER. The CS understood this to mean that MAHAFFY and WALKER had already met with other customers earlier that day to provide them with narcotics as the CS has seen MAHAFFY and WALKER do in the past. At one point during the conversation, MAHAFFY asked the CS, "You wanna go outside?" The CS's understanding of what MAHAFFY was referring to was that once outside, MAHAFFY and WALKER would provide the CS with cocaine on a fronted basis, as MAHAFFY and WALKER have done in past dealings with the CS. The CS, who had already placed an order for food, responded, "Yeah, I'll get 'em to go." According to the CS, the CS was telling MAHAFFY that the CS was willing to get the food he just ordered to go so that the CS would not delay the meeting between MAHAFFY, WALKER, and the CS in the parking lot where the CS would receive the narcotics from MAHAFFY and WALKER. Shortly thereafter, the CS, MAHAFFY and WALKER left Blackie's.

14. At approximately 11:23 a.m., law enforcement observed the CS and two male individuals, later identified as WALKER and MAHAFFY, exit Blackie's. Law enforcement observed all three individuals walk toward the parking lot where the CS's vehicle, the Minivan, and the Trailblazer were parked. Law enforcement observed the CS, WALKER, and MAHAFFY approach the Minivan. Law enforcement observed the CS open the side, sliding door of the Minivan and remove a black duffle bag out of the Minivan. Shortly thereafter, law enforcement observed MAHAFFY enter the Trailblazer, exit the parking lot, and drive South on Clark Street. Law enforcement observed WALKER enter the Minivan, exit the parking lot, and drive South on Clark Street. Law enforcement observed the CS enter his/her vehicle, exit the parking lot, and drive South on Clark Street.

15. The CS was followed by law enforcement to a predetermined meeting location. Once at the meeting location, the CS provided law enforcement with the black duffle bag that he/she received from WALKER. Law enforcement discovered five individually wrapped packages containing what appeared to be cocaine. The substance inside one of the packages was later field-tested with positive results for the presence of cocaine. The suspect cocaine is being submitted to the DEA North Central Laboratory for testing. The recording device and transmitter was also recovered from the CS. The CS was debriefed regarding the meeting at the parking lot between the CS, WALKER, and MAHAFFY. The CS explained that when the three approached the Minivan, WALKER said, "should be open." The CS then opened the sliding door of the Minivan and asked, "this the bag right here?" WALKER

responded, "yeah." The CS explained that both MAHAFFY and WALKER were present when the CS removed the duffle bag from the Minivan.

16. Following the meeting between the CS, WALKER, and MAHAFFY, law enforcement conducted a stop on the Minivan driven by WALKER. After identifying WALKER and locating approximately $7,000 in cash on WALKER's person, WALKER was allowed to leave the scene with the $7,000.

17. Shortly after leaving the scene of the stop, WALKER called the CS's telephone. This call was not recorded as the CS was no longer in the presence of law enforcement. According to the CS, WALKER asked the CS words to the effect of, "how the fuck could you do this to me?" WALKER also told the CS that WALKER wanted to meet the CS at Duke's. The CS contacted law enforcement and relayed the information regarding the phone call. Shortly thereafter, the CS met with law enforcement.

18. At approximately 12:32 p.m., in the presence of law enforcement, the CS placed a consensually recorded telephone call to telephone number (773) 567-3334. The CS identified WALKER as the speaker on the other end of the call. During the call, WALKER asked the CS, "Where you at?" In response, the CS told WALKER where the CS's present location was and also told WALKER, "I'll call you when I get close" (referring to Duke's).

19. At approximately 1:26 p.m., in the presence of law enforcement, the CS placed a consensually recorded telephone call to telephone number (773) 567-3334. The CS identified WALKER as the speaker on the other end of the call. During the call, the CS told

-11-

WALKER that the CS was "right here at Best Buy trying to get a phone real quick." In response, WALKER told the CS, "Don't worry about...don't worry about it I took care of all that." WALKER then instructed the CS to not delay getting to Duke's any further, and added, "I don't want to be sitting here all day....I took care of all that though." The CS responded, "All right."

20.     At approximately 1:56 p.m., the CS received an incoming telephone call. According to the caller identification feature on the CS's telephone, the incoming telephone call was from telephone number (773) 567-3334. This call was recorded. The CS identified WALKER as the speaker on the other end of the call. During the call, WALKER asked the CS, "Where you at?" The CS responded, "I just walked out of Best Buy...I'm coming that way" (referring to Duke's). WALKER responded, "C'mon, man, you bull-shittin' man!" WALKER added, "Hurry up, man." The CS responded, "All right."

21.     Shortly thereafter, law enforcement established surveillance near the vicinity of Duke's. Law enforcement observed the Trailblazer in the parking lot between Pepe's Restaurant and Duke's. Minutes later, law enforcement observed WALKER arrive at Duke's in a different minivan than the Minivan in which WALKER was stopped. Shortly thereafter, law enforcement affected the arrests of WALKER and MAHAFFY inside of Duke's.

22.     At the time of WALKER's arrest, law enforcement observed approximately five cellular telephones, some in boxes and some out of boxes, inside of a plastic bag located on the bar directly in front of WALKER and MAHAFFY.

23. Following MAHAFFY's arrest, MAHAFFY gave agents consent to search the Trailblazer which revealed a "trap" commonly used to conceal narcotics.

24. Based on the foregoing, there is probable cause to believe that WALKER WALKER, a/k/a "Verb," and FRED MAHAFFY conspired with each other and others to knowingly and intentionally possess with the intent to distribute and to distribute a controlled substance, namely, five kilograms or more of a mixture containing cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 846.

FURTHER AFFIANT SAYETH NOT

_____
CHRISTOPHER M. SOYEZ
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before
me this _____ day of April 2008

_____
Honorable Susan E. Cox
United Sates Magistrate Judge